## HICKMAN v. UNION PAC. R. CO.

No. 7303.   Decided January 17, 1950.   (213 P. 2d 650.)

See 32 C. J. S., Evidence, sec. 715. Evidence, photographs, see note, 9 A. L. R. 2d 899. See, also, 20 Am. Jur. 607.

*S. J. Carter,* Salt Lake City, *L. E. Nelson,* Logan, *Elias L. Day,* Salt Lake City, for appellant.

*Bryan P. Leverich,* Salt Lake City, *M. J. Bronson,* Salt Lake City, *A. U. Miner,* Salt Lake City, *Howard F. Coray,* Salt Lake City, for respondent.

PRATT, Chief Justice.

This is an appeal from a general jury verdict in favor of the defendant Railroad Company of "no cause of action." The suit arose out of an automobile-train collision on U. S. Highway 91, near Logan, Utah, at a point approximately two miles southwest of Logan, where a Union Pacific spur track crosses that highway. The collision occurred on October 30, 1947 between 6:45 and 7:00 P. M. The highway and the spur track intersect at substantially right angles. The highway is 22 feet wide at this point, consisting of two 11 foot traffic lanes. The track is a single track spur. There is a cross buck sign on each side of the track, situated on the right hand side of the highway for approaching traffic. There is no other permanent protection at the crossing.

The plaintiff, driving his 1941 Buick, was driving toward Logan, where he lived. He was accompanied by Melvin Squires, a business associate. The train was composed of eight empty beet cars, which are ordinary coal cars with raised wooden side boards thereon. The cars were being pushed along the spur track toward a beet dump, by the engine which was backing up. The automobile struck the first car of the train as it was crossing the highway. Plaintiff testified that his speed as he approached the crossing was between 45 and 50 miles per hour, or just under 50 miles per hour. He is corroborated in this respect by Patrolman Reese, who was parked along the highway and who observed him pass. This speed was controverted by a member of the train crew who observed the automobile in motion from his vantage point on the train, and who testified that the automobile was traveling at 60 miles per hour.

The automobile struck the beet car at the rear of the front trucks of that car as it was being propelled across the

highway. This point is eight feet approximately, from the front end of the car. According to the plaintiff the beet car was about half way into his lane, or a little more, when he first observed it. The thing which called his attention to the beet car was an outcry from Mr. Squires who shouted a warning when he observed the train. Mr. Squires, who testified on behalf of the defendant stated in substance that he saw the train out in the field before he saw it on the highway, and it was when he saw the train in the field that he gave the warning. The time interval however was short as he also testified that immediately as he shouted, he saw the highway obstructed. The testimony of plaintiff and Mr. Squires conflicts materially as to the point where Mr. Squires shouted the warning. Mr. Squires located the point on the highway where he first observed the train and called the warning in relation to a small frame shack beside the road which was in excess of 500 feet from the crossing. The observation and warning were given soon after passing this shack. Mr. Hickman, to the contrary, stated that he observed the train as soon as he had warning from Mr. Squires, and that he immediately applied his brakes. The physical evidence indicates skid marks of approximately 83-85 feet in length. To this must be added the reaction time that it took plaintiff to apply his brakes, estimated by plaintiff as 55 feet. Plaintiff appears to have made no effort to turn out to avoid the train although the physical surroundings were such as to permit such a course of action. In explanation plaintiff said,

"I did not know how far I was from the track and I thought I could stop."

Members of the train crew testified that the train was switching empty beet cars onto the siding at a beet dump located there. That the train had crossed the highway twice prior to this time, and that as the train approached this time, it stopped to allow two automobiles to go past the crossing. The train stopped just before coming onto a

bridge over a canal, which bridge, as shown on a map drawn to scale and admitted in evidence, is 60 feet from the highway. The brakeman observed no other automobiles coming, and so signaled the train to proceed. He then took his position on the highway. Observing plaintiff's automobile approaching, he began to signal him with his lantern. The brakeman indicated in his testimony that he was so concerned with plaintiff's car approaching at such a high speed, that he failed to observe and signal a car approaching from Logan at approximately the same time. The train crew further indicated in their testimony that the train was proceeding about 2 miles per hour, and that the train whistled when it started up, and that the train was equipped with an automatic bell which was ringing during the entire time. Plaintiff testified that he heard no whistle or bell, and that he saw no signal light at the crossing. Patrolman Reese heard no whistle or bell and saw no light. He was following plaintiff's car approximately 1/10th of a mile behind it. Mrs. Archibald, who was driving an automobile approaching from the opposite direction at approximately the same time and from approximately the same distance heard no whistle, nor bell, but did see a light when she came close to the tracks, which light she thought was a flashlight. She stated that she imagined the man holding it was facing her and moving the light in front of his body, and that just before the crash he ran in the direction of plaintiff's approaching automobile. She testified that the train loomed up suddenly out of the darkness, that she observed it as the result of plaintiff's headlights shining underneath it and on the wheels, and that she stopped as a result. She observed the lights of plaintiff's automobile some distance down the highway. She heard the screech of brakes, and the impact, and she estimated the speed of the plaintiff's automobile at the time of the crash at about 40 miles per hour. She indicated that she thought the end of the beet car would be about at the center line of the highway at the time of the crash, and that the freight train was barely creeping.

Patrolman Reese, plaintiff, and Mrs. Archibald all agree that it was a dark night. The train crew indicate that it was not dark, and that the moon was shinning. There was introduced in evidence a report of the U. S. Weather Station indicating that from 6:00 to 7:00 P. M. the sky was partly cloudy and clearing, and that from 7:00 to 8:00 the sky was clear. It is uncontroverted that Squires observed the train while it was in the field.

Plaintiff testified that about the time he passed the patrolman he dimmed his lights and that he did not thereafter change them to high beam. The effect of dimming his lights, he said, was to throw the beam down in front of the car and he was not able to see the sides of the road very well, as they were obscured. He also testified that his lights on dim would show an object about 75-100 feet ahead, and that with the lights on bright he could see the side of the road from fence to fence. With his lights on bright he estimated he could see from 300 to 400 feet and later fixed this at 350 feet.

The assignments of error argued fall into three categories:

(1)  Errors in the admission of certain photographs into evidence, and refusal to strike them from the record.

(2)  Errors in the giving of certain instructions.

(3)  The refusal to give a requested instruction.

Relative to category one, it is contended that the court erred in allowing photographs of the scene of the accident into evidence on behalf of the defendant. The photographs were introduced on cross-examination of a photographer called on behalf of the plaintiff, who also had taken photographs of the scene of the accident. The photographer who took the pictures for defendant was not present. In view of the fact that plaintiff's own witness established that the photographs represented conditions substantially as they were at the time of the accident, no error

was committed in the admission of these photographs, nor in the refusal to strike the same.

As to errors in the giving of instructions, it is contended first that the court erred in instructing the jury as follows: Instruction No. 7:

"* * * You are instructed that when a railroad company is using its right-of-way in a careful and lawful manner the employees in charge of its trains have a right to presume that motorists approaching on streets or highways which cross the railroad track will proceed carefully and lawfully, and the railroad company's employees have a right to presume that motorists on the highway will drive with their cars under such control as to be able to stop within the distance at which they can see objects ahead,"

and: Instruction No. 9

"* * * After the cars of such a train are upon and occupying or passing over a highway the presence of such train or cars lawfully upon such highway is a sufficient warning to approaching travelers and such travelers on the highway are bound to see such train of cars on the highway in time to stop and to avoid colliding therewith."

It is contended that these two instructions read together assume that the train was on the crossing all the time while the plaintiff was a sufficient distance away from the crossing to have looked and stopped before colliding with the defendant's train. They also assume that the railroad cars were lawfully upon the highway and that this is assuming the important fact that is in issue; that this was prejudicial error since there is no evidence in the record that defendant's train was occupying or passing over the highway before plaintiff applied his brakes.

The defendant's theory of this case was that their train was on the highway and that plaintiff should have seen it in time to avoid colliding with it. Mrs. Archibald testifying on behalf of plaintiff indicated that the train was barely creeping. The train crew established the speed as not over two miles per hour. The evidence

most favorable to plaintiff indicates that the train was half way across the plaintiff's lane of traffic when he saw it, or approximately 5½ feet across. The shoulder is 8 feet wide, as established by plaintiff's witness. Defendant's train then traveled some 13½ feet at 2 miles per hour when it was clearly on the highway or passing over the highway and visible to the plaintiff had he looked. 13½ feet at 2 miles per hour, when converted into time, amounts to approximately 4½ seconds that the train took to travel across the shoulder and one half the plaintiff's traffic lane. Thus, during this length of time, plaintiff, as indicated by the testimony, would have traveled considerably in excess of the 183 feet, required to bring his automobile to a complete stop. Plaintiff's view was entirely unobstructed ahead and on either side. There were no automobiles approaching between his automobile and the railroad tracks, the lights of which might have impaired his view of the crossing and the approaching train. To the contrary, the lights from Mrs. Archibald's automobile would have been of assistance to him, in seeing the train. These facts, together with the testimony of Mr. Squires which clearly puts the plaintiff considerably further from the crossing when the train started across the road are sufficient to entitle the defendant to have its theory submitted to the jury. *Haarstitch* v. *Oregon Short Line R. Co.*, 70 Utah 552, 262 P. 100; *Nikoleropoulous* v. *Ramsey*, 61 Utah 465, 214 P. 304; *Horsley* v. *Robinson*, 1948, 112 Utah 227, 186 P. 2d 592. The instructions as given were predicated upon the defendant's train being operated in a reasonable and prudent manner. While the quoted portions of the instructions may not have general application in all cases where trains are upon or passing over highways and streets, under the facts of this case, it was not error for the court to instruct as it did.

It is next contended that the court erred in giving instruction number 18, which it is contended offends against the general rule with respect to the form and ■

sufficiency of an instruction on contributory negligence. We quote that instruction:

"If you find that the plaintiff was contributorily negligent you must find by a preponderance of the evidence one or more of the particulars described in this instruction to be true and that the negligence described in said particular was a proximate cause of the collision:

"(a) That an employee of the defendant company was on the said crossing, waving his lantern in such manner that plaintiff saw it or with reasonable care in his driving could have seen it in time to have discovered the presence of the train and stopped before arriving at the track;

"(b) That the plaintiff, with reasonable care in his driving, saw or heard or as a reasonable, prudent man, under the circumstances, knowing of the existence of said track, should have seen or heard the approaching train in time to have stopped before arriving at the track;

"(c) That plaintiff was driving in excess of 50 miles per hour immediately prior to the time he applied his brakes in an attempt to stop for this train;

"(d) That plaintiff failed to drive at a proper, reduced speed when approaching said crossing;

"(e) That plaintiff was driving too fast, as he approached the crossing, to stop in the distance that he could see an object on the highway ahead;

"(f) That the plaintiff's passenger saw the train on the crossing and warned plaintiff of its presence in time for the driver, using due care, to have stopped before reaching the track;

"(g) That the train was plainly visible to the plaintiff and that it emitted an audible signal and that plaintiff failed to stop within due care, to have stopped before reaching the track;

"(h) That plaintiff did not expect the train to be on that track and for that reason failed to keep a proper lookout."

It is contended that the instruction as given is suggestive, misleading and confusing. The exception taken to this instruction was as to the instruction as a whole. Each of the theories of contributory negligence set forth in the instruction has foundation in the evidence in the record to support

it, entitling the defendant to have the matter presented to the jury, and the jury was entitled to find the facts from the conflicting evidence. There is nothing misleading or confusing about the instruction as given, and it is no more suggestive than is any other recital of theories of negligence where such theories are enumerated and set forth; and it clearly indicated to the jury that these were theories of contributory negligence, and that it was for them to find whether any of these defenses had merit or not from the evidence.

Finally, it is contended that the court should have given plaintiff's requested instruction number 1. ▮▮▮ It reads:

"The law imposed a duty upon the defendant to exercise ordinary care and caution in driving and operating its locomotive and train of cars at the time this accident occurred.

"If you find from the evidence that the defendant failed to exercise such care and caution in the operation of its said locomotive and train of cars either in maintaining a look-out for approaching traffic or in a failure, if any, to give any signal or warning of the presence or approach of the train of cars attached to its said locomotive, then I instruct you that such failure, if any, to exercise ordinary care, constitutes negligence as a matter of law upon the part of defendant, and if such negligence, if any, proximately contributed in any degree, however slight, to the accident and injuries, if any, sustained by plaintiff, then I instruct you that your verdict must be in favor of plaintiff and against defendant, provided that you further find that the plaintiff was not guilty of negligence proximately contributing to the happening of the accident or to the injuries, if any, which he sustained."

There is nothing in the record to indicate that a proper lookout was not maintained. Plaintiff's contention as to this point is that Section 77-0-14, U. C. A. 1943, as amended, does not offer sufficient protection on little used spur tracks and therefore has application only to main line crossings. Nothing in the statute however so limits its application. The case of *English* v. *Southern Pacific Railway Co.*, 13 Utah 407, 45 P. 47, 35 L. R. A. 155, 57 Am. St. Rep. 772,

indicates that the duty where trains cross highways may be increased, depending upon the locality and traffic. Thus, in a city a flagman or a gate may be required as amounting to reasonable care. It is, however, for the jury to say from the facts what constitutes reasonable care under those facts. The amount of traffic on this spur track was a matter upon which evidence was introduced. The balance of instruction number 7, as given told the jury that the train had to be kept under reasonable control and that the operators of the train had no right to assume that the crossing would be clear but must be vigilant and anticipate the presence of others. Instruction number 8 told the jury that the statutory requirement was that the locomotive ring its bell continuously, and that if it did not do so nor blow its whistle then defendant was negligent, and instruction number 9 told the jury that there was no requirement in the Utah law which required the train crew to set out flares or have lights on the cars when backing across streets, but that reasonable care was required, and that it was for the jury to determine from all the facts of the case whether the defendant's employees exercised reasonable care at this crossing. Thus, the matters contained in plaintiffs requested instruction was substantially covered in the instructions as given. It was not error for the trial court to refuse to give plaintiff's requested instruction number one.

The judgment of the lower court is affirmed. Costs to the respondent.

WADE, LATIMER, and McDONOUGH, JJ., concur.

WOLFE, Justice (concurring in the result).

The duty to drive an automobile no faster than will enable it to be stopped within the distance in which its headlights will reveal objects on the highway, is based on a rule which is designed to regulate speed. It is an attempt to correlate speed with visibility. In general, it is not coterminous with the duty to keep a lookout at night for objects

on the highway as well as for objects which may be moving onto the highway or which have the potentiality for doing so, such as domestic animals straying along the road. These two duties—one to keep within a speed limit which will allow stopping within the distance in which objects are revealed by the lights, the other to at all times keep a lookout and especially at night for objects which may be or move on the highway—are closely related. Under certain circumstances these two duties may tend to become one. That one is not equvialent to the other becomes apparent when we consider the case where the cones of illumination made by automobile headlights reveal objects on the highway quite far away but in no way protect the driver against the exigency of an animal walking into that cone of light from the darkness almost directly in front of. his automobile, or at least well within the distance which his lights reveal objects. And I do not think the duty not to exceed a speed which will permit the driver to stop within the distance in which his lights will reveal objects ahead can be substituted for the driver's duty to watch for objects moving into the path of his automobile at night. One is a duty relating to speed; the other is a duty of lookout which is more comprehensive and is always related to speed and facility for seeing. The speed to be maintained so as to satisfy the requirement of reasonable care in the latter case may be quite different from the rather mathematical one of driving at a speed which will enable the driver to stop where his lights reveal objects on the road. The former duty depends largely upon the circumstances. It certainly encompasses the circumstances of approaching a railroad crossing at night where the duty to look and listen is a part of an automobile driver's whole duty.

A moving train of cars being slowly propelled onto a country highway by an engine in a backing movement, that is, the engine being in the rear of the train, may approximate the movement of an animal onto the highway. At least, regardless of the force which activates the movement

—the mind of an animal controlling muscular movements or the force of an engine pushing a train of cars in the nighttime onto a highway—the result may be the same. In this case, laying aside for a moment the question of liabilities and duties in respect to the movement, had a large horse walked onto the highway at two miles an hour, a like collision might have resulted although the consequences of it might have been different.

An instruction in the case of a slowly moving train across the highway which states, as did instruction No. 7, in this case, that the

"railroad company's employees have the right to presume that motorists on the highway will drive their cars under such control as to be able to stop within the distance at which they can see objects ahead"

may not fit many situations because the train approaching a cone of light may be illuminated by it too late to avoid a collision even though the lights would reveal objects *in the path of the automobile* a considerable distance ahead of the point of impact. Hence the employees could not presume that the moving train of which they were the crew could be seen at night by a motorist who was going at a speed which would enable him to stop within the distance in which his lights would reveal objects and that he was therefore bound to stop and avoid the collision. Instruction No. 7 has no place where the object is not on the highway or close enough thereto to present the opportunity for the lights to reveal it when the forward movement of the automobile would bring the lights to shine on the objects, but is being gradually projected or moved onto the highway, especially where there is a question as to when the lights first revealed the moving object.

If the situation is one in which the evidence shows that the train was intruded into the cone of light at such a distance ahead of the automobile as to be revealed in time so that the motorist, going at a speed which would enable him to stop within the distance his lights would reveal

objects, could have avoided the accident by stopping or going around the train, instruction No. 7 would be applicable. A simple instruction in such a case would be to tell the jury that if after the motorist saw or could have seen the train by its being illuminated by the lights of his car in time to have stopped or gone around it, and failed to do so he would have been guilty of negligence, for if he were going at a speed which would have enabled him to stop after he saw the train and failed to do so, he would have been guilty of negligence even though he was going at a speed less or no greater than that which would enable him to stop within the distance his lights would reveal objects. But if the train were intruded into his cone of light at a time when he had no time to stop at the speed he was going, either this speed would not have been the proximate cause of the accident, but the intrusion of the train the sole cause, or if his speed was a contributing cause it would not be because it was greater than the speed which would enable him to stop within the distance he could see objects by his lights but because either he was exceeding the prescribed speed of 50 miles an hour or because he was proceeding at a speed greater than he should have in view of the fact that he was approaching a railroad track which he knew was there or by the cross-buck should have known was there. So it comes down to this, that in any case unless a moving object has come onto the roadway at such a distance before an approaching automobile so as to be illuminated by the lights of the said automobile when by their power they would first catch a stationary object, instructions as to the speed-light range relationship are not applicable but confusing. Put in another way, where a moving object intrudes itself into the cone of light made by the lights of an automobile at a point nearer to the car than the total distance in which its lights will first reveal objects, instructions as to the speed-light range relationship are not applicable.

Taking the evidence most favorable to the plaintiff, it is apparent that instruction No. 7 was applicable in the instant case. The evidence reveals that the train was moving across the highway at a speed of two m. p. h. At this speed, as indicated in the prevailing opinion, it took the train 4½ seconds to traverse the 13½ feet of track from the outer edge of the shoulder of the highway to the center of the lane of pavement in which the plaintiff was traveling. During these 4½ seconds when the train was there upon the highway where it could be seen—and that is the important element in regard to objects on the highway—the plaintiff, if he was traveling 45 m. p. h., traversed 297 feet; yet he did not see the train until he was too close to avoid hitting it. Traveling at 45 m. p. h., the plaintiff would require 157 feet to stop, but by his own testimony he could see only 75-100 feet ahead of him with his lights on dim. Under his own testimony, he was probably negligent as a matter of law. He was going too fast to timely catch objects on the highway in order to avoid a collision.

There was other evidence which would not involve the speed-distance relationship such as the evidence that plaintiff when about 500 feet back of the point of impact was apprised of the presence of the train and yet failed to stop in time to avoid a collision. There is not a satisfactory explanation as to why for this reason he did not stop in time, but I doubt whether that evidence would make Instructions No. 7 and No. 9 applicable. These two instructions become applicable because, under the theory of the defendant, plaintiff, by his own evidence, was going too fast to stop short of the crossing after his lights revealed the train when it was well on the highway and therefore capable of being seen. I have thought it well to treat this phase of the case with more definiteness than the prevailing opinion appears to have treated it in the hope that the speed-distance-visibility relationship as laid down in the cases of *Dalley* v. *Mid-Western Dairy Products Co.*, 80 Utah 331, 15 P. 2d 309, and *Haarstitch* v. *Oregon Short*

*Line R. Co.*, 70 Utah 552, 262 P. 100, will not be further extended to situations except where they are clearly applicable. As hitherto expressed in a former decision, I have doubt whether those cases did not present facts which warranted their submission to the jury.